UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

SOUTH KINGSTOWN SCHOOL   :
COMMITTEE,         :
     Plaintiff,     :
             :
v.            :  C.A. No. 13-127ML
             :
JOANNA S. as Parent of P.J. S.,  :
     Defendant.   :

**REPORT AND RECOMMENDATION**

Patricia A. Sullivan, United States Magistrate Judge

   This case involves a disabled student's entitlement to independent and comprehensive evaluations pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.* ("IDEA"), at the expense of the South Kingstown School Committee ("School"). The School has appealed from the Administrative Decision ("Decision") of an Impartial Due Process Hearing Officer ("Hearing Officer"), which requires the School to provide the student, "PJ," with an independent occupational therapy evaluation and a new comprehensive series of "psychoeducational" evaluations, including "assessments in reading, writing, math, sensory difficulty, written language executive function, behavior, independent function, difficulty with balance and gross motor skills, and assistive technology." Complicating this appeal is a Settlement Agreement that the School and PJ's mother ("Mother") executed a few months before the instant proceeding, resolving with prejudice a prior due process complaint that sought substantially the same relief.

   The parties' cross motions for summary judgment have been referred to me for report and recommendation. For the reasons that follow, I recommend that this Court grant the School's

motion for summary judgment (ECF No. 11) and deny the Mother's cross-motion for summary judgment (ECF No. 13).

## I.   FACTUAL BACKGROUND[1]

### a.   Education History

PJ was born in June 1999 and attended second and third grade, which he repeated, in North Kingstown, Rhode Island.  R. Ex. 10.  Although he seemed to be on track academically, in 2009, PJ was referred to the Bradley School, a day treatment program affiliated with a children's psychiatric hospital, for a forty-five day placement as a result of his daily struggle in transitioning from home to school.  R. Ex. 10.  PJ had been refusing to enter school, at times locking himself in his parents' car or becoming aggressive.  Id.

During the forty-five day Bradley placement, in addition to extensive clinical psychological and psychiatric evaluations, PJ attended school in a small, self-contained classroom.  Sch. Ex. 1.  While at Bradley, attention was paid to a potential diagnosis of Autism Spectrum Disorder.  Id.  The Bradley team noted that all teachers observed that PJ was functioning normally, while his parents' ratings suggested difficulties well above the cut-off for Autism Spectrum Disorders.  The Bradley Report concluded that, while PJ clearly had serious difficulties at home and in the transition to school, as well as underdeveloped social skills, there was not sufficient evidence of the pervasive nature of Autism Spectrum Disorder to warrant the diagnosis.  R. Ex. 10; Decision at 14.  The Bradley educators observed severe difficulty transitioning into school and difficulties with spelling and writing, though generally PJ was functioning at or near grade level; the Bradley clinical psychological/psychiatric evaluation

---

[1] These facts are taken from the Decision; the administrative record, consisting of transcripts ("Tr."), the School's exhibits ("Sch. Ex.") and the Respondent/Mother's exhibits ("R. Ex."); the School's Statement of Undisputed Facts ("SUF"); and the Mother's Statement of Facts in Dispute.

diagnosed anxiety disorder NOS, disruptive behavior disorder NOS and parent-child relational problem.  Id.  PJ made significant progress in the Bradley program.  Decision at 14.

Several months later, in November 2009, another extensive test battery was conducted by Dr. Laurence M. Hirshberg, a psychologist at the Brown University Neurodevelopment Center, and his team.  Dr. Hirshberg performed a diagnostic interview of PJ, observed him interacting with his Mother and obtained ratings from home, which identified serious deficits, and from school, which were largely normal.  Dr. Hirshberg commented that the degree of inconsistency between the reports from home and the reports from school was "extreme and puzzling." Nevertheless, based on the Mother's observations and his own testing, and despite the acknowledged difficulty of drawing a final conclusion "given the discrepancy of reports between home and school," Dr. Hirshberg diagnosed Autism Spectrum Disorder.  R. Ex. 11.  In February 2010, Dr. Paul Weigle, psychiatrist, diagnosed severe agoraphobia without panic disorder, anxiety, depression NOS and disruptive behavior disorder.  Sch. Ex. 1 at 3.

At some point, PJ and his Mother moved to Wakefield, Rhode Island; in early January 2010, midway through his fourth grade year, PJ transferred to the South Kingstown schools. Sch. Ex. 1 at 2.  For the balance of fourth, fifth and into sixth grade, his Mother did not believe that he made adequate progress.  Because of his extreme resistance to separating from his Mother and transitioning to school throughout this period, PJ's school attendance steadily declined until he completely stopped coming in February 2012.  Decision at 12; Sch. Ex. 1 at 5.

       b.  First Due Process Proceeding and Settlement Agreement

On February 9, 2012, the Mother served the School with a "Parent Statement of Input and Concerns and Actions Proposed," in which, among other requests, she asked for ten evaluations, some comprehensive (a series of evaluations) and some independent.  R. Ex. 37.  An

individualized education program ("IEP") meeting was held on February 12, 2012, where the most significant problem discussed was PJ's resistance to attending school; the School reported that he did not exhibit anxiety or noncompliance once there.  Decision at 16.  This was quickly followed on February 17, 2012, by the mother's filing of a "Special Education Request for Impartial Due Process Hearing" ("First Due Process Proceeding"), claiming that PJ is eligible for special education and related services as a child with disabilities, including Asperger's disorder, social anxiety disorder, agoraphobia and depression.  Sch. Ex. 1.

In her due process request, the Mother asked that PJ be placed in a small private school and for eight evaluations (some comprehensive and some independent),[2] as well as other benefits, such as tuition for summer camp, karate lessons, private tutoring and attorney's fees. Sch. Ex. 1 at 6.  After a hearing officer was assigned to the matter, the Mother, assisted by legal counsel, and the School began a resolution process; in the context of the due process hearing, they settled all of the claims raised in the First Due Process Proceeding.  Tr. Vol. IV at 48, 79.

---

[2] The evaluations sought in connection with the First Due Process Proceeding were:

- A comprehensive achievement evaluation;
- A comprehensive cognitive evaluation;
- An independent comprehensive assistive technology evaluation to assess all areas of educational needs;
- An independent speech and language evaluation and/or speech and language therapy as a related service by a highly qualified speech and language pathologist with peer acceptable education and experience in servicing students with autism;
- An independent occupational therapy evaluation and therapy as a related service by a highly-qualified occupational therapist with peer acceptable education and experience in servicing students with autism;
- An independent reading evaluation by a highly qualified individual with peer acceptable education and experience with the five essential components of reading as outlined in 20 U.S.C. § 6301 *et seq.* ("No Child Left Behind Act") and an independent individualized research based reading program utilizing responses to scientific based research interventions;
- An independent math evaluation and an independent individualized research based reading program utilizing responses to scientific based research interventions;
- An independent educational program evaluation for the purposes of assessing the current educational program and current educational needs and to make detailed recommendations.

Sch. Ex. 1 at 6.

Their agreement is memorialized in a legally binding written agreement,[3] which the School

contends is a "written settlement agreement" pursuant to IDEA and the applicable federal and

state IDEA regulations ("Settlement Agreement").  Sch. Ex. 2; see 20 U.S.C. § 1415(f)(1)(iii); 34

C.F.R. § 300.510; Rhode Island Board of Regents for Elementary and Secondary Education

Regulations Governing Children with Disabilities in Education ("RI-BRESE") § 300.510.  After

the parties executed the Settlement Agreement, the First Due Process Proceeding was dismissed

with prejudice.  See Ruling in Response to Mot. of Petitioner at 1, Dec. 12, 2012.

The Settlement Agreement resolved three claims for the balance of the 2011-2012 school

year and for all of the 2012-2013 school year: eligibility, placement and evaluations.  First, it

provided that PJ is eligible for special education services.  For placement, it required that PJ

should attend the Wolf School[4] for the remainder of the current school year, if possible, and for

all of the following year, with transportation provided by the School.  Regarding evaluations, the

Agreement resolved the Mother's request for eight comprehensive/independent evaluations with

the compromise that four would be performed:

> The claimant shall immediately cooperate with the District in order for the district
> to expeditiously complete the following evaluation(s) of PJ: educational,
> cognitive, speech and language and occupational therapy.

Also regarding evaluations, the Settlement Agreement specified that a "neuropsychological

evaluation" would not be performed.  Finally, the Agreement mandated payment of $8,000 for

the Mother's attorney's fees.

---

[3] The only copy of the Settlement Agreement in the record that came to this Court is not signed.  However, the
parties do not dispute that it was fully executed and is legally binding.  SUF 4.  Indeed, the Mother has sued the
School in Superior Court to enforce an aspect of it.  Accordingly, this Court treats it as a fully executed, legally
binding agreement.

[4] The Wolf School is a private special education day program promoting an immersion model curriculum design that
integrates and incorporates into each classroom's teaching speech and language therapy and occupational therapy in
order to meet the needs of children with learning differences who do not present with primarily behavioral demands.
Its program is approved by the Rhode Island Department of Education.  ECF No. 13-1 at 8.

In consideration for these promises, the Mother expressly waived any other rights PJ might have related to his education, agreeing that:

> Claimant hereby waives any and all causes of action and claims related to PJ's Education which Claimant knows or should have known, including but not limited to claims for compensatory services, that they might otherwise hold against, and further releases from any and all liability, the District . . . with regard to any and all claims arising out of or in any way related to PJ's education.

Reflecting the intent of the parties for finality, the Settlement Agreement recited as its purpose:

> [S]ettl[ement] of all claims, and causes of action, whether or not asserted, about which the Claimant knows or should have known, arising out of the education of "PJ" by the District covering the entire time from their initial enrollment, in the District through the date of this Agreement, including but not limited to those raised in the pending due process complaint.

The Agreement stipulated that the First Due Process Proceeding "is withdrawn / dismissed with prejudice."  Consistent with the requirements of 34 C.F.R. § 300.510(d); RI-BRESE § 300.510(d), for a settlement reached in an IDEA "resolution process," it provided that it "shall be governed and enforced in accordance with the applicable federal and state laws relevant regulations" and that "any disputes . . . shall be enforceable in the United States District Court for the District of Rhode Island . . . ."  An integrated agreement, the Settlement Agreement stated that it "constitutes the entire agreement between the parties."

Based on the Settlement Agreement, PJ was referred to the Wolf School, which accepted him for a forty-five day evaluation beginning in September 2012.[5]  Also in compliance with the Settlement Agreement, the School performed the four required evaluations in April and May 2012.  Sch. Exs. 4, 5, 6, 8.

---

[5] For reasons that the record does not reveal, PJ was not accepted by the Wolf School for the remainder of the 2011-2012 school year.  However, it did agree to take him for a forty-five day diagnostic/evaluation period, with the agreement to enroll him, if that went well, for the 2012-2013 school year.  It did go well and PJ attended the Wolf School for all of the 2012-2013 school year.  Tr. Vol. I at 81-82.

The process of undergoing just these four evaluations seemed to be torture for PJ.  Id.; Decision at 17-20.  He was rarely cooperative, insisting on his mother's presence, and for one test, refusing to continue unless his dog could sit on his lap.  Decision at 17-20; Tr. Vol. I at 77. One examiner expressed concern the testing was too stressful for PJ.  Decision at 19.  Two of the evaluations took two days as the examiners tried to accommodate PJ's agitation and anxiety. Because of PJ's resistant behavior, some of the examiners questioned the degree to which the results could be considered reliable.  Id.  These evaluations were sent to the Wolf School, which advised the School that it would supplement them with its own assessments and that they were adequate so that additional evaluations would not be needed.  Tr. Vol. II at 96.

       c.   Second Due Process Proceeding

PJ entered the Wolf School for the forty-five day diagnostic phase on September 4, 2012. During September, the Wolf School performed additional screening and formal and informal assessments – this included assessments in mathematics, occupational therapy, language arts (written language and reading) and speech.  Sch. Ex. 11.  With all of the information gathered from the School's evaluations, its own assessments, PJ's records and the observations of its professionals, the Wolf School prepared an IEP for PJ based on his educational needs.  Tr. Vol. 21-24, 32.  At the request of the Mother, the Wolf School accelerated its plan to hold an IEP meeting in November, and scheduled one for October 9, 2012.  Representatives from both the Wolf School and the School attended.  The Wolf School staff went step by step through the IEP, making changes to reflect the Mother's concerns.

At the end of this IEP meeting, the Mother made an oral request for many more evaluations.  She now claims that, at the meeting, she asked for independent do-overs of the four listed in the Settlement Agreement, as well as for six other comprehensive sets of evaluations,

each of which is requested twice, with the testing to be done first by the School and then independently, paid for by the School.  The School insisted that this complex request must be reduced to writing before it would respond.[6]  On October 22, 2012, the Mother sent the School a written proposal for ten more evaluations or sets of evaluations.  Sch. Ex. 3.  In addition to an independent version of each the four evaluations done pursuant to the Settlement Agreement, the list[7] includes the neuropsychological evaluation that the Settlement Agreement specified the School would not perform and otherwise overlaps significantly with what the Mother requested in advance of the First Due Process Proceeding.  See Tr. Vol. IV at 83 (Mother's concerns from February 2012 and October 9, 2012, are "substantially the same").

Apart from its legal argument that more evaluations are barred by the Settlement Agreement, the School declined to perform so many more evaluations because they were

---

[6] In what sounds to this Court like a gotcha game, the Mother claims that she (or her attorney) presented her requests for more evaluations as the IEP meeting was breaking up on October 9, 2012.  She argues that the School's insistence on a written request is a violation requiring dismissal of the due process complaint, which was not filed within fifteen days as required by RI-BRESE § 300.502(b)(2) ("without unnecessary delay, and not later than 15 calendar days from receipt of a request").  The Hearing Officer found that a writing is not required, but rejected the Mother's specious argument that the complaint should be dismissed based on such a technical procedural violation. I agree.  In addition, based on the testimony of the educators present at the meeting, I alternatively find that there was no violation because whatever was said on October 9, 2012, was ineffective to trigger the running of the fifteen-day clock in light of the breadth and complexity of the Mother's request.  I recommend that this argument be rejected; it will not be discussed further in this Report and Recommendation.  See G.J. v. Muscogee Cnty. Sch. Dist., 668 F.3d 1258, 1270 (11th Cir. 2012) (not every procedural defect results in a violation of IDEA).

[7] The evaluations requested on October 22, 2012, are as follows:

- An independent achievement evaluation;
- An independent psychological evaluation (to include observation and parent interview);
- An independent speech and language evaluation;
- An independent OT evaluation;
- A comprehensive neuropsychological evaluation (IEE after initial series of reevals);
- A comprehensive psychiatric evaluation (IEE after initial series of reevals);
- A comprehensive reading evaluation (5 essential components of reading per NCLB) (IEE after initial series of reevals);
- A comprehensive math evaluation (IEE after initial series of reevals);
- A comprehensive assistive technology evaluation (IEE after initial series of reevals);
- A comprehensive PT evaluation (IEE after initial series of reevals).

Sch. Ex. 3.  "IEE" refers to "independent educational evaluation."  34 C.F.R. § 300.502.

unnecessary based on PJ's positive progress at the Wolf School[8] so that there was no need to put him through such an ordeal.  The School's Director of Special Education testified that, "[i]t would not, in my professional opinion, with a student with high anxiety, to put him under a microscope and put him in that situation would cause really undue stress, where the real way you can understand and see a child is in the natural setting with curriculum-based measures."  Tr. Vol. II at 103.  The School's psychologist testified that more psychological testing was not necessary because the testing already done indicated cognitive abilities within average range, "so I don't see a need, especially for a youngster who experiences so much difficulty in those situations."  Tr. Vol. II at 64.  The School's view that more evaluations were unnecessary was buttressed by the Wolf School educators, who concluded that no further testing was needed to set the needs, goals and objectives for PJ's IEP.  Tr. Vol. III at 32, 41, 57, 84; Tr. Vol. IV at 9, 26.  All were satisfied that their program was properly tailored to PJ's educational needs.  Id.

In light of its refusal to perform independent do-overs of the four evaluations already done, the regulations required the School to initiate a due process proceeding, which it did on October 30, 2012 ("Second Due Process Proceeding").  34 C.F.R. § 300.502(b)(2) (if parent disagrees with an evaluation and requests an independent one, agency must either provide it or file a due process complaint); RI-BRESE § 300.502(b)(2).  The resulting hearing involved multiple motions and four days of testimony from the Mother, six witnesses from the School, seven from the Wolf School, the Mother's expert, Dr. Steven Imber, and, despite the displeasure of the Hearing Officer, PJ himself.  Tr. Vol. IV at 38.

Throughout the administrative process, the School asserted the Settlement Agreement as a bar to any more evaluations for the school years covered by the Agreement (2011-2012 and

___

[8] The Mother's expert, Dr. Steven Imber, testified that PJ's most significant issue had been getting to school and that his attendance at the Wolf School was "generally quite good;" he opined that "[i]t is a good placement."  Tr. Vol. IV at 97-98.

2012-2013).  The Hearing Officer denied the School's motion for relief, finding that the

Settlement Agreement is not a bar because the evaluations sought by the Mother in the Second

Due Process Proceeding "were not all the same" and were "sufficiently different" from those

sought in the First Due Process Proceeding.  See Ruling in Response to Mot. of Petitioner at 2,

Dec. 12, 2012.  During the hearing, the Hearing Officer ruled that the Settlement Agreement was

not relevant and yet permitted extensive testimony about it.  Tr. Vol. II at 94-95; Tr. Vol. III at

10, 153, 156-57; Tr. Vol. IV at 51-52.  In her Decision, she refers to it, but does not say whether

she gave it any consideration or whether it affected her decision.  See Decision at 17, 21.

d.   <u>Hearing Officer Decision</u>

In her Decision, the Hearing Officer addressed two issues: (1) whether independent

evaluations must be performed because the four conducted by the School were not "appropriate;"

and (2) whether further evaluations are necessary.  Decision at 21, 26.

On the first issue, the Hearing Officer reviewed each of the four evaluations for

appropriateness.  She found that the School's psychological and speech and language evaluations

were appropriate, rejecting both the Mother's and Dr. Imber's criticism of them.  She found that

the psychological evaluation was appropriate because the evaluator complied with applicable

procedures; speech and language evaluation was appropriate because it provided useful

information and met the requirements of the regulations.  Her rejection of Dr. Imber's opinion

was based on her finding that it was formed solely from information provided by the Mother, and

that he did not know the student, did not observe him and did not speak to any of his teachers or

the examiners.  Decision at 22.  The Mother has not appealed from these findings.

By contrast, the Hearing Officer found that the School's educational evaluation was "not

appropriate" because the examiner was unable to complete the testing despite two days of trying

due to PJ's "out of control" behavior: "[t]his examiner made a valiant effort to move forward to assess the Student, but her effort failed."  Decision at 24.  The School does not dispute the Hearing Officer's finding that the incomplete educational evaluation was "not appropriate."

The School's appeal to this Court places two of the Hearing Officer's findings in issue. First, the Hearing Officer concluded that the occupational therapy evaluation was not appropriate because it was not "sufficiently comprehensive to identify all of the Student's needs in this area," and thus is contrary to 34 C.F.R. § 300.304(c)(6) and RI-BRESE § 300.304(c)(6).  Second, on the issue of new evaluations, the Hearing Officer "order[ed] a comprehensive <u>psychoeducational</u> <u>evaluation</u>, to include assessments in reading, writing, math, sensory difficulty, written language, executive function, behavior, independent functions, difficulty with balance and gross motor skills, and assistive technology."  <u>Id.</u> (emphasis in original).

## II.   <u>STANDARD OF REVIEW</u>

In reviewing an IDEA administrative decision, the court accords due deference to the hearing officer's findings of fact but reviews the rulings of law *de novo*.  <u>Linda E. v. Bristol Warren Reg'l Sch. Dist.</u>, 758 F. Supp. 2d 75, 86-87 (D.R.I. 2010).  While the court must give due weight to the hearing officer's decision, ultimately it must make an independent decision based on the preponderance of the evidence.  <u>Abrahamson v. Hershman</u>, 701 F.2d 223, 230 (1st Cir. 1983); <u>see</u> <u>Lessard v. Wilton-Lyndeborough Coop. Sch. Dist.</u>, 518 F.3d 18, 24 (1st Cir. 2008) (court must engage in a bounded, independent review of hearing officer's decision).  The court's deference to the hearing officer's fact findings is in recognition that judges are not "trained pedagogues," and therefore it must "accord deference to the state agency's application of its specialized knowledge."  <u>Lessard</u>, 518 F.3d at 24.

An IDEA motion for summary judgment does not limit the court to considering the facts in the light most favorable to the non-moving party; rather, it is a procedural device through which to decide the case on the basis of the administrative record. Bristol Warren Reg'l Sch. Dist., 758 F. Supp. 2d at 87 (quoting Cranston Sch. Dist. v. Q.D., C.A. No. 06-538ML, 2008 WL 4145980, at *5 (D.R.I. Sept. 8, 2008)).  In making its decision, the court must impose the burden of proof on "the party 'challenging the outcome of the administrative decision,'" here the School. See Schaffer v. Weast, 546 U.S. 49, 62 (2005); Bristol Warren Reg'l Sch. Dist., 758 F. Supp. 2d at 87 (quoting Cranston Sch. Dist., 2008 WL 4145980, at *5).

After the court has performed a thorough yet deferential review, it is free to accept or reject the hearing officer's findings in whole or in part. Town of Burlington v. Dep't of Educ., 736 F.2d 773, 792 (1st Cir. 1984).  If the hearing officer's decision is not supported by the evidence in the record, it must be reversed. Millay ex rel. YRM v. Surry Sch. Dep't, 707 F. Supp. 2d 56, 64 (D. Me. 2010) (hearing officer reversed when "decision is not supported by the evidence in this record or by his stated findings."); see also Carlisle Area Sch. v. Scott P., 62 F.3d 520, 528 (3rd Cir. 1995) (while hearing officer's credibility findings deserve deference, decision reversed if objective evidence justifies contrary conclusion or record read in its entirety compels a contrary conclusion).  In evaluating the evidence, the court should afford deference to local educators over the testimony of outside experts. See Sebastian M. ex rel. Michael M. v. King Philip Reg'l Sch. Dist., 685 F.3d 79, 86 (1st Cir. 2012) (proper to credit testimony of educators over outside experts who spent little time with child); Hartmann v. Loudoun Cnty. Bd. of Educ., 118 F.3d 996, 1003-05 (4th Cir. 1997), cert. denied, 522 U.S. 1046 (1998) (local educators deserve latitude in determining individualized education program most appropriate).

### III.   LEGAL OVERVIEW

#### a.   IDEA

IDEA mandates that the state must provide all disabled children with a free and appropriate public education ("FAPE") as a condition for receiving federal funds.  20 U.S.C. §§ 1401(9), 1412(a)(1)(A).  The primary vehicle for delivery of a FAPE is the child's IEP.  Lessard, 518 F.3d at 23.  The IEP must include, at a minimum, the child's present level of educational attainment, the short and long term goals for his or her education, objective criteria to measure progress towards those goals and the specific services to be offered.  Id. § 1414(d)(1)(A).  It is subject to procedural and substantive requirements, which can flow from both federal and state law, to the extent that the latter is not incompatible with the former.  See Roland M. v. Concord Sch. Comm., 910 F.2d 983, 987 (1st Cir. 1990).   In interpreting IDEA, courts must heed the caution of the Supreme Court in Board of Education v. Rowley, 458 U.S. 176 (1982), that IDEA does not require school districts to provide special education students with the best education available, or to provide instruction that maximizes the student's abilities.  Id. at 200-01; Lt. T.B. ex rel. N.B. v. Warwick Sch. Comm., 361 F.3d 80, 83 (1st Cir. 2004).  Rather, school districts are required only to provide a "basic floor of opportunity" that consists of access to specialized instruction and related services individually designed to provide educational benefits to the student, and the choice of methodology in providing special education and related services is the prerogative of the school district.  Mr. I. ex rel. L.I. v. Maine Sch. Admin. Dist. No. 55, 480 F.3d 1, 10 (1st Cir. 2007).

#### b.   Evaluations and the Power of the Hearing Officer to Order Them

To make a determination of eligibility for services under IDEA and the child's educational needs, which is the essential input to develop the IEP, the child must be evaluated

using assessment tools and strategies to gather relevant functional, developmental and academic information, including information provided by the parent.  20 U.S.C. § 1414(a); 34 C.F.R. § 300.304(a-b); RI-BRESE § 300.304(a-b).  The child must be assessed in all areas related to the suspected disability and the evaluations must be sufficiently comprehensive to identify all of the child's special education and related service needs.  34 C.F.R. § 300.304(c)(4, 6); RI-BRESE § 300.304(c)(4, 6).  After the initial evaluation, the child's IEP Team (defined in 34 C.F.R. § 300.321; RI-BRESE § 300.321) and "other qualified professionals as appropriate" may determine that reevaluation or additional evaluation is needed to determine the educational needs of the child.  34 C.F.R. § 300.305(a); RI-BRESE § 300.305(a).  In addition, subject to certain limits, reevaluation must be done if requested by the parent or teacher.  20 U.S.C. § 1414(a)(2); 34 C.F.R. § 300.303(a)(2); RI-BRESE § 300.303(a)(2).  IDEA and the regulations limit the obligation of the school district to pay for unnecessary reevaluations: "A reevaluation  . . . shall occur . . . not more frequently than once a year, unless the parent and the local educational agency agree otherwise," provided that reevaluation every three years is required "unless the parent and the local educational agency agree that a reevaluation is unnecessary."  20 U.S.C. § 1414(a)(2)(B); 34 C.F.R. § 300.303(b); RI-BRESE § 300.303(b).  A reevaluation is not required to mimic the depth and breadth of the initial evaluation.  <u>Robert B. ex rel. Bruce B. v. W. Chester Area Sch. Dist.</u>, No. Civ.A 04-CV-2069, 2005 WL 2396968, at *6 (E.D. Pa. Sept. 27, 2005).

The IDEA regulations provide the parent with a limited right to obtain an independent educational evaluation at public expense.  Perry Zirkel, <u>Independent Educational Evaluation Reimbursement under the IDEA</u>, 231 Ed. Law Rep. 21, 21 (June 12, 2008).  An independent evaluation is one "conducted by a qualified examiner who is not employed by the public agency responsible for the education of the child in question."  34 C.F.R. § 300.502(a)(3)(i); RI-BRESE

§ 300.502(a)(3)(i).  The limited right arises only after the agency has procured an evaluation with which the parent "disagrees."  34 C.F.R. § 300.502(b); RI-BRESE § 300.502(b).  The regulations limit the parent to one independent evaluation at public expense each time the public agency conducts an evaluation with which the parent disagrees.  Id.

Once the parent expresses her disagreement, she may request an independent do-over at public expense, which the agency must either provide or, within fifteen days file a due process complaint to establish that its evaluation is "appropriate."  RI-BRESE § 300.502(b)(2).  If the agency's evaluation is found to be "appropriate," the parent may still obtain an independent evaluation at her own expense.  34 C.F.R. § 300.502(b)(3); RI-BRESE § 300.502(b)(3).  To determine whether the agency's evaluation is "appropriate," the hearing officer must consider whether the agency adequately gathered functional, developmental and academic information about the child's needs to determine the content of the IEP in all areas of suspected disability and was sufficiently comprehensive to identify all of the child's needs.  20 U.S.C. §§ 1412(a)(6)(B), 1414(b)(1-3); 34 C.F.R. § 300.304(b)(1-3), (c)(4, 6); RI-BRESE § 300.304(b)(1-3), (c)(4, 6). The statute and regulations are pellucid – the"[p]arent is entitled to an independent evaluation if the school district's evaluation is deficient" in light of the child's educational needs and not otherwise.  See Seattle Sch. Dist., No. 1 v. B.S., 82 F.3d 1493, 1500 n.3 (9th Cir. 1996).

As an arm of the Rhode Island Department of Education, a statutorily created administrative agency lacking common law powers, the hearing officer's power to order evaluations, reevaluations or independent evaluations is limned by IDEA and the federal and state regulatory framework.  Anchorage Sch. Dist. v. D.S., 688 F. Supp. 2d 883, 891 (D. Alaska 2009) (hearing officer reversed for crafting remedy that was "simply not a power in the hearing officer's repertoire"); see Narragansett Elec. Co. v. Pub. Utils. Comm'n, 773 A.2d 237, 240 (R.I.

2001) (agency cannot exceed its statutory authority); <u>Little v. Conflict of Interest Comm'n</u>, 121

R.I. 232, 236, 397 A.2d 884, 886 (1979) (administrative agencies do not have common-law

powers).  A hearing officer cannot *sua sponte* order an evaluation except to the extent authorized

by IDEA or the regulatory scheme.  Zirkel, <u>The Remedial Authority of Hearing & Review</u>

<u>Officers Under the Individuals with Disabilities Education Act: An Update</u>, 31 J. Nat'l Ass'n

Admin. L. Judiciary 1, 15 (2011) (citing <u>Hempfield Sch. Dist. v. Tyler M.</u>, 38 IDELR P 68, at

281 (Pa. Commw. Ct. 2003)).  Thus, a hearing officer can order an independent evaluation only

if the evidence establishes a deficient evaluation with which the parent disagrees.  However,

when the hearing officer properly orders an independent evaluation pursuant to the regulatory

scheme, it must be done at public expense.  34 C.F.R. § 300.502(d); RI-BRESE § 300.502(d).[9]

<u>Cf.</u> <u>Manchester-Essex Reg'l Sch. Dist. Sch. Comm. v Bureau of Special Educ. Appeals</u>, 490 F.

Supp. 2d 49, 54 (D. Mass. 2007) (Massachusetts regulation permits hearing officer to order

additional evaluations "when necessary").

    c.  <u>Settlement Agreements under IDEA</u>

The plain language of the Settlement Agreement, foreclosing "with prejudice" any more

evaluations beyond those provided for by the Agreement until after the 2012-2013 school year,

was the elephant in the living room during the Second Due Process Proceeding.  Unsurprisingly

in light of the muddle of the law on settlements in the IDEA context, the Hearing Officer was

confused by how to approach it and what role it should play in her determination.  <u>See generally</u>

Mark C. Weber, <u>Settling Individuals with Disabilities Education Act Cases: Making Up is Hard</u>

---

[9] The Mother argues that this regulation vests the hearing officer with a roving commission to order independent evaluations.  34 C.F.R. § 300.502(d); RI-BRESE § 300.502(d) ("If a hearing officer requests an independent educational evaluation as part of a hearing on a due process complaint, the cost of the evaluation must be at public expense.").  One commentator agrees, suggesting that the regulation empowers hearing officers to solicit independent expert opinions without regard to the regulatory scheme.  <u>See</u> S. James Rosenfeld, <u>It's Time for an</u> <u>Alternative Dispute Resolution Procedure</u>, 32 J. Nat'l Ass'n Admin. L. Judiciary 544, 567 (2012).  This is simply wrong – the hearing officer's powers are those authorized by statute and regulation; she does not have the inherent power to make up remedies out of whole cloth.  <u>See</u> <u>Anchorage Sch. Dist.</u>, 688 F. Supp. 2d at 891.

to Do, 43 Loy. L.A. Rev. 641, 641-42 (2010) ("even though IDEA . . . has been around since the 1970s, litigants are still without clear guidance about how the mechanisms of settlement should work, what the settlement agreement ought to look like, and what to do if either side of the dispute fails to live up to its agreement").

The starting point for this Court's analysis must be the intent of Congress in enacting the IDEA amendments in 2004: to promote alternative dispute resolution between parents and school districts so that they are encouraged to resolve their differences through compromise.  Weber, supra, at 647.  Unfortunately, while making clear that IDEA settlements are to be encouraged and enforced, these amendments did little to guide hearing officers and courts in how to regard them.  Nevertheless, congressional intent is clear – this Court must respect settlements in the IDEA setting as a preferred method for dispute resolution.  Somoza v. N.Y.C. Dep't of Educ., 475 F. Supp. 2d 373, 387 (S.D.N.Y. 2007), rev'd on other grounds, 538 F.3d 106 (2d Cir. 2008) (settlement agreements are encouraged by IDEA and should be upheld by courts).

Turning to the applicable law, it is well settled that a settlement agreement voluntarily and willingly entered by the parties constitutes "a binding contract between the parties and should [be] enforced as written."  D.R. v. E. Brunswick Bd. of Educ., 109 F.3d 896, 898 (3d Cir. 1997).  The federal court should apply the state law of contract to the interpretation of the settlement.  See, e.g., Robert v. Cobb Cnty. Sch. Dist., 279 F. App'x 798, 801 (11th Cir. 2008) (per curiam) (breach of settlement agreement does not require adjudication of plaintiffs' rights under IDEA); Bowman ex rel. W.B. v. Dist. of Columbia, Civil Action 05-01933(HHK), 2006 WL 2221703, at *1 (D.D.C. Aug. 2, 2006) (although settlement agreement relates to and touches on IDEA, it is a simple breach of contract claim governed by state law).

The parent's regret over compromises in the settlement agreement does not affect its enforceability.  Kasenia R. ex rel. M.R. v. Brookline Sch. Dist., 588 F. Supp. 2d 175, 190-91 (D.N.H. 2008).  Consistent with the goal of Congress to encourage IDEA settlements, courts enforce such agreements even if there is arguably a compromise of the child's entitlement to a FAPE.  E.D. ex rel. Dukes v. Enter. City Bd. of Educ., 273 F. Supp. 2d 1252, 1268 (M.D. Ala. 2003) (federal policy requires enforcement of settlement agreements to avoid reducing them to a nullity) (citations omitted).  Thus, a settlement agreement like this one, which includes an unambiguous waiver of the child's educational rights,[10] is enforceable.  E. Brunswick Bd. of Educ., 109 F.3d at 898; see Ballard v. Phila. Sch. Dist., 273 F. App'x 184, 188 (3d Cir. 2008) (parent's claim that settlement agreement falls short of providing child with FAPE does not inherently violate law or public policy).  Further, a settlement agreement that cabins the child's entitlement to evaluations has evidentiary value in informing the determination of what testing is necessary under IDEA.  See W. Chester Area Sch. Dist., 2005 WL 2396968, at *6.

Federal subject matter jurisdiction to enforce an IDEA settlement exists when the settlement was reached either in connection with a "mediation," pursuant to 20 U.S.C. § 1415(e); 34 C.F.R. § 300.506; RI-BRESE § 300.506, or in connection with a "resolution process," pursuant to 20 U.S.C. § 1415(f)(1)(B); 34 C.F.R. § 300.510; RI-BRESE § 300.510.  An IDEA settlement must be set out in a legally binding written agreement signed by the parties and reached in the context of a due process proceeding to confer federal jurisdiction to enforce it.  20 U.S.C. § 1415(f)(1)(B)(iii)(II); 34 C.F.R. § 300.510(d); RI-BRESE § 300.510(d); see L.A. &

---

[10] The Mother argued that the Settlement Agreement did not waive PJ's rights to a FAPE, so that it must be interpreted as preserving his right to ask for more services for the period covered by its terms.  This argument is less than candid in light of the unambiguous language of the Settlement Agreement that the Mother signed: "Claimant hereby waives any and all causes of action and claims related to PJ's Education."  This argument will not be addressed further in the Report and Recommendation.

G.A. ex rel. M.A. v.  Granby Bd. of Educ., 227 F. App'x 47, 50 (2d Cir. 2007) (quoting

Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 382 (1994)).  When the written

agreement incorporates IDEA so that the court must refer to it to determine the respective

obligations of the parties, the court should find that it arises under federal law.  R.K. ex rel. T.K.

v. Hayward Unified Sch. Dist., No. C 06-07836 JSW, 2007 WL 2778702, at *6 (N.D. Cal. Sept.

21, 2007) (federal jurisdiction over settlement agreement because it references IDEA).

      The Mother belatedly asserts that the School has not sustained its burden of establishing

that this Settlement Agreement was reached in connection with a "resolution process," pursuant

to 20 U.S.C. § 1415(f)(1)(B); 34 C.F.R. § 300.510; RI-BRESE § 300.510.  Her argument is

belied by her acceptance of the Agreement, which, consistent with the statute and applicable

regulations, recites that it "shall be enforceable in the United States District Court for the District

of Rhode Island" and that it "shall be governed and enforced in accordance with the applicable

federal and state laws relevant regulations."  See 20 U.S.C. § 1415(f)(1)(B)(iii)(II); 34 C.F.R. §

300.510(d)(2); RI-BRESE § 300.510(d)(2); Hayward Unified Sch. Dist., 2007 WL 2778702, at

*6.  It is also contradicted by the uncontroverted representations in the administrative record that

the resolution was reached as part of the First Due Process Proceeding.[11]  I find that this

Settlement Agreement was adopted in connection with an IDEA "resolution process," that there

is federal jurisdiction to enforce it and that it satisfies the requirements of 20 U.S.C. §

1415(f)(1)(B)(iii)(II) and the applicable regulations.  34 C.F.R. § 300.510(d); RI-BRESE §

300.510(d).

      In any event, federal jurisdiction over the Settlement Agreement is not necessary to

consideration of its preclusive effects, which is the crux of the School's argument.  This Court's

---

[11] The record is replete with representations by both parties that this settlement was reached as part of the First Due
Process Proceeding.  See, e.g., Tr. Vol. I at 111; Tr. Vol. II at 95; Tr. Vol. III at 9, 105, 126; Tr. Vol. IV at 79.

jurisdiction over this IDEA appeal from the Second Due Process Proceeding is based on 20

U.S.C. § 1415(i)(3)(A), and is not dependent on jurisdiction over the Settlement Agreement.

With unchallenged federal jurisdiction over the IDEA appeal, this Court does not need

jurisdiction over the merits of the state proceeding to apply the doctrine of *res judicata* as a bar

to relitigation of issues terminated by a final judgment in state court.  See Koolen v. Mortg. Elec.

Registration Sys., Inc., No. CA 12-951-M, 2013 WL 3289111, at *3 (D.R.I. June 28, 2013)

(federal suit barred by *res judicata* based on state court judgment); Morey v. Rhode Island, 359

F. Supp. 2d 71, 79 (D.R.I. 2005) (same).  Accordingly, while I find that there is federal

jurisdiction to enforce this IDEA Settlement Agreement, I further find that preclusion based on

the Settlement Agreement, as well as its evidentiary effect, must be considered by this Court

without regard to whether federal jurisdiction would lie to enforce it.

One point of difference among the cases, which has not been addressed in this Circuit, is

whether the hearing officer is empowered to enforce a settlement agreement and, if not, what

consideration such agreements must be given.  While many hearing officers do enforce them,

and courts affirm their decisions, other courts look to the language of the statute, 20 U.S.C. §

1415(f)(1)(B)(iii)(II), which refers to enforcement only by courts, and hold that the hearing

officer, whose powers are limited to those specifically conferred by law, lacks jurisdiction to

enforce a settlement agreement.  Compare H.C. ex rel. L.C. v. Colton-Pierrepont Cent. Sch.

Dist., 341 F. App'x 687, 689-90 (2d Cir. 2009); J.K. v. Council Rock Sch. Dist., 833 F. Supp. 2d

436, 448 (E.D. Pa. 2011); Justin R. ex rel. Jennifer R. v. Matayoshi, Civil No. 10-00657 LEK-

RLP, 2011 WL 2470624, at *13 (D. Haw. June 17, 2011), with Hayward Unified Sch. Dist.,

2007 WL 2778702, at *6-9; Traverse Bay Area Intermediate Sch. Dist. v. Mich. Dep't of Educ.,

No. 5:06-CV-139, 2007 WL 2219352, at *9-10 (W.D. Mich. July 27, 2007).  Some courts

consider the reality that contract enforcement will not benefit from a hearing officer's

educational expertise; that is an arena where courts have the "specialized knowledge and

experience." Council Rock Sch. Dist., 833 F. Supp. 2d at 449.

Whether this Hearing Officer had the power to preside over a contract enforcement action

need not be resolved by this Report and Recommendation because neither party made a motion

to enforce and no motion seeking enforcement is presented in this Court.[12]  Rather, the School's

argument during the administrative proceeding and in this Court is based on the preclusive effect

of the Settlement Agreement, invoking the doctrine of *res judicata*.  In addition, the Settlement

Agreement is a binding memorialization of the Mother's compromised request for evaluations

applicable to the time period it covers; accordingly, it is evidence that is highly relevant to her

request for more evaluations for the same period.  See 20 U.S.C. § 1414(a)(2)(A)(i)(parent

request triggers entitlement to reevaluations subject to limitations); W. Chester Area Sch. Dist.,

2005 WL 2396968, at *6 (parents' challenge to content of reevaluation weakened by settlement

agreement in which parents consented to such content).  Whatever may be the scope of a hearing

officer's jurisdiction to enforce an IDEA settlement agreement, the cases are uniform in holding

that it is error simply to ignore it.  See, e.g., Colton-Pierrepont Cent. Sch. Dist., 341 F. App'x at

690 n.3 (hearing officer must consider settlement agreement despite lack of power to enforce);

D.B.A. ex rel. Snerlling v. Special Sch. Dist. No. 1, Civil No. 10-1045 (PAM/FLN), 2010 WL

5300946, at *4 (D. Minn. Dec. 20, 2010) (while hearing officer lacks power to enforce

---

[12] If the School files a motion for summary judgment to enforce the Settlement Agreement based on the Mother's breach of the Settlement Agreement in seeking more evaluations, including the neuropsychological evaluation precluded by the settlement, judgment in its favor might well be granted.  See Council Rock Sch. Dist., 833 F. Supp. 2d at 454.  However, such a motion is not before the Court and I will not attempt to scour the record for the undisputed facts that must be considered in determining whether to grant such a motion.  See Stephen H. v. W. Contra Costa Cnty. Unified Sch. Dist., No. C 06-06655 TEH, 2007 WL 1557482, at *2 (N.D. Cal. May 29, 2007) (enforcement of IDEA settlement must be made in context of motion for summary judgment based on state law governing contract interpretation and admission of extrinsic evidence).

settlement agreement, error for hearing officer to conclude that he was precluded from reviewing and interpreting it).

Accordingly, I find that the Settlement Agreement is an enforceable IDEA settlement, that it includes an enforceable waiver of PJ's educational entitlements for the period it covers, that there is federal jurisdiction to enforce it and that it was error for the Hearing Officer not to consider its preclusive effects under applicable law and not to consider the evidentiary impact of the binding agreement made by the Mother about what evaluations should be performed.

### d.  *Res Judicata* Effect of Settlement Agreements

The School argues that this Court should reject the relief granted by the Hearing Officer because it is barred by the claim preclusion prong of the doctrine of *res judicata.*  "The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as '*res judicata*.'" Taylor v. Sturgell, 553 U.S. 880, 892 (2008); see Plunkett v. State, 869 A.2d 1185, 1188 (R.I. 2005).  Under claim preclusion, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." Allen v. McCurry, 449 U.S. 90, 94 (1980).  Claim preclusion applies when "there exists identity of parties, identity of issues, and finality of judgment in an earlier action." Beirne v. Barone, 529 A.2d 154, 157 (R.I. 1987).  An IDEA settlement by the parents on behalf of the child establishes identity of parties with the child. Ross v. Bd. of Educ. of Twp. High Sch. Dist., 486 F.3d 279, 284-85 (7th Cir. 2007).

Federal courts must give state judgments the *res judicata* effect that state law prescribes. Tang v. State of R.I., Dep't of Elderly Affairs, 904 F. Supp. 69, 72 (D.R.I. 1995) (citing Isaac v. Schwartz, 706 F.2d 15, 16 (1st Cir. 1983)).  Under Rhode Island law, a settlement agreement to resolve a proceeding with prejudice has the "full force and effect of a decree and is *res judicata*,"

barring subsequent suits raising claims raised or that could have been raised.  Marsh v. Billington Farms, LLC, No. 04-3123, 2006 WL 2555911, at *8 (R.I. Super. Ct. Aug. 31, 2006) (*res judicata* bars claims that were or could have been raised in a settlement).  When parties agree to settle a dispute and enter judgment with prejudice based on the settlement, the terms of that judgment, in relation to the legal and factual claims in dispute, are subject to the doctrine of *res judicata*. Langton v. Hogan, 71 F.3d 930, 935 (1st Cir. 1995) (judgment with prejudice based on settlement bars second suit on same claim).  It is equally clear that *res judicata* applies to the final determinations of administrative agencies just as it applies to those of courts.  See Aunyx Corp. v. Canon U.S.A., Inc., 978 F.2d 3, 7 (1st Cir. 1992) ("decisions of administrative agencies are entitled to res judicata effect when the agency acted in a judicial capacity").  Rhode Island law has long accepted the *res judicata* effect of final determinations of administrative agencies. Town of Richmond v. Wawaloam Reservation, Inc., 850 A.2d 924, 933 (R.I. 2004) (*res judicata* applies to administrative decisions); Dep't of Corrs. v. Tucker, 657 A.2d 546, 549 (R.I. 1995) (*res judicata* applies to decision of quasi-judicial administrative tribunal).

　　　　While IDEA cases discussing *res judicata* are scarce, the few found concur that it bars a subsequent due process petition raising a claim already determined in a prior administrative proceeding from which the parties did not appeal.  See, e.g., Dep't of Educ. v. Karen I., 435 F. App'x 670, 672 (9th Cir. 2011) (*res judicata* precludes subsequent proceeding seeking remedy within the scope of claim resolved by IDEA settlement agreement incorporated into state court judgment); E. Brunswick Bd. of Educ., 109 F.3d at 899-900 (ALJ finding that settlement agreement was binding barred second due process petition).  As in other legal settings, *res judicata* promotes judicial economy by preventing repetitive litigation not only over the actual claims made, but also over claims that could have been raised, including claims based on future

events as long as the facts that give rise to such events were known or could have been known at the time of settlement.  See Sutliffe v. Epping Sch. Dist., 584 F.3d 314, 329 (1st Cir. 2009); DeWitt v. Wall, 121 F. App'x 398, 399 (1st Cir. 2004) (per curiam) (citing DiBattista v. State, 808 A.2d 1081, 1086 (R.I. 2002)); Foretich v. Landsburg Co., 2 F. App'x 45, 46 (1st Cir. 2001) (per curiam).  Application of the doctrine to bar repetitive IDEA claims is consistent with the intent of Congress to encourage resolution of educational disputes by compromise.

The doctrine of *res judicata* is properly invoked by the School.  There is identity of parties in that the Mother and School are the litigants in both proceedings.  There is identity of claims in that both address what evaluations should be performed in connection with PJ's education for the 2011-2012 and 2012-2013 school years.  While not necessary to this analysis because the bar is based on claim preclusion, there is also identity of issues in light of the similarity of the lists of demanded evaluations presented in the First and Second Due Process Proceedings and of the request for a psychoeducational evaluation, which was specifically foreclosed by the Settlement Agreement.  See Koolen, 2013 WL 3289111, at *3-4.  Consistent with the intent of the parties, as unambiguously expressed in the Settlement Agreement, to bar subsequent ligation of any claims, "whether or not asserted, about which the Claimant knows or should have known, arising out of the education of 'PJ'," there is the requisite finality in the dismissal with prejudice of the First Due Process Proceeding.  Accordingly, I find that all of the elements of *res judicata* are present so that the Settlement Agreement is a bar to the Mother's attempt to obtain additional evaluations for the 2011-2012 and 2012-2013 school years.

The Hearing Officer's ruling on the preclusive effects of this Settlement Agreement is based on an error of law.  Reliance on her finding that the list of evaluations at the First Due Process Proceeding was somewhat different ("they are not all the same") from the list in issue at

24

the Second Due Process Proceeding turns the claim preclusion prong of *res judicata* on its head.

Once the elements of identicality of parties and the termination of the prior proceeding "with

prejudice" are established, the breadth of what is barred is defined by reference to the "claim,"

here evaluations for the school years covered by the Agreement.  All relief that was sought or

that could have been sought based on facts known or that could have been known is barred.  In re

Carvalho, 335 F.3d 45, 49 (1st Cir. 2003); Dowd v. Soc'y of St. Columbans, 861 F.2d 761, 763

(1st Cir. 1988).  With a record that presents no new circumstances that were not knowable at the

time of the Settlement Agreement (except for the Mother's dissatisfaction with the four

evaluations actually performed), the settlement with prejudice of a claim for evaluations for a

specified time period bars relitigation of what evaluations are needed for the same period.  See

Russo v. Baxter Healthcare Corp., 919 F. Supp. 565, 569 (D.R.I. 1996).

IV.   **ANALYSIS**

a.   Should the Hearing Officer Have Ordered an Independent Occupational
     Therapy Evaluation?

The Settlement Agreement requires the School to "complete . . . evaluation . . . of . . .

occupational therapy" and provides that this obligation should be interpreted "in accordance with

the applicable federal and state laws relevant regulations."  Sch. Ex. 2.  Grounded in IDEA and

entered into as part of an IDEA resolution process, this language in the Settlement Agreement

cannot properly be interpreted to permit the School to discharge its contractual duty to

"complete" an evaluation by supplying one that is "not appropriate" under IDEA.  Rather, the

Settlement Agreement unambiguously incorporates the federal and state regulatory provisions

that create a limited right to an independent do-over of an evaluation if the parent is dissatisfied

and the hearing officer finds that the underlying evaluation is not "appropriate."  This

interpretation of the Settlement Agreement is affirmed by the School's acquiescence in the Hearing Officer's conclusion that the incomplete educational evaluation was "not appropriate."

I find that the Settlement Agreement must be interpreted as contemplating that the four evaluations must be "appropriate" as defined by IDEA, so that the Mother's dissatisfaction with them and the School's refusal to provide an independent do-over properly triggered a due process proceeding focused on their appropriateness. 34 C.F.R. § 300.502(b); RI-BRESE § 300.502(b). Thus, the Settlement Agreement did not bar the Hearing Officer from proceeding with the Second Due Process Proceeding on the limited question of the "appropriateness" of the four required evaluations.

Next, mindful of the deference due to the Hearing Officer's findings based on her educational expertise, I turn to a review of the totality of the record regarding the appropriateness of the occupational therapy evaluation performed by the School, as supplemented by the Wolf School, to determine whether it was "sufficiently comprehensive" to identify all of the Student's special education and related services needs as required by 34 C.F.R. § 300.304(c)(6); RI-BRESE § 300.304(c)(6). Determinations of "appropriateness" present mixed questions of law and fact. Lessard, 518 F.3d at 24.

In reaching the conclusion that the occupational therapy evaluation was not appropriate, the Hearing Officer found that the evaluator was "qualified, licensed and experienced," and made no adverse credibility finding with respect to her testimony. Nevertheless, she critiqued the evaluation on the ground that the evaluator "was unaware of the Parent's concerns about the Student's sensory functioning."[13] This finding is not supported by the record: the occupational

---

[13] The Hearing Officer also criticized the evaluator's reference to "typical" sensory processing abilities without defining the term "typical." This criticism is belied by the report itself, which specifies that "typical performance" is one of the three scoring categories in the sensory profile assessment tool and defines "typical performance" as a test score demonstrating the absence of questionable or definite processing problems.

therapist testified that she was aware of the parent's sensory processing concerns before she initiated the evaluation and the report itself recites, "Reason for evaluation: . . . sensory processing concerns."  Sch. Ex. 8; Tr. Vol. I at 143.

In making her finding, it is possible that the Hearing Officer credited Dr. Imber's testimony that "[PJ] has some very substantial sensory issues, very substantial."  Tr. Vol. IV at 84.  However, Dr. Imber never met PJ; his impressions are entirely derivative of the 2009 Hirschberg report, which referred only to "some degree of sensory processing dysfunction."  R. Ex. 11.  It is also possible that the Hearing Officer's finding that the occupational therapy evaluation was "not appropriate" was based on PJ's resistant behavior and lack of effort during the evaluation.  Yet the Hearing Officer failed to consider that this deficit was cured by the additional assessments done by the occupational therapist at the Wolf School, who testified that she found the School's evaluation useful and supplemented it with her own testing to formulate the occupational therapy portion of PJ's IEP.  Based on her review of PJ's records, including the Hirshberg report, the School's evaluation and her own assessments, she concluded that PJ's sensory processing difficulties could be addressed by the services that the Wolf School model already provided and that no more occupational therapy evaluations were needed, including in the area of sensory processing.  Tr. Vol. IV at 5-9.  The Hearing Officer simply disregarded all of this testimony – importantly, she also made no adverse credibility finding regarding the Wolf School's occupational therapist.

I find legal error in the Hearing Officer's failure to consider the Wolf School's supplementation of the initial occupational therapy evaluation, which was performed with such difficulty because of PJ's behavior.  34 C.F.R. § 300.304(b)(1); RI-BRESE § 300.304(b)(1) (agency evaluation may consist of a variety of assessment tools and strategies to gather relevant

information to assist in determining content of IEP). In so doing, she also improperly ignored the uncontradicted testimony of the local educational experts from the Wolf School that the evaluative information available fully addressed PJ's sensory processing difficulties and was adequate to assess his occupational therapy needs and to formulate goals and objectives for his IEP.[14] Faulders ex rel. Faulders v. Herico Cnty. Sch. Bd., 190 F. Supp. 2d 849, 853 (E.D. Va. 2002) (expert evaluations made after limited review and interaction with child cannot substitute for experience and interaction of educators with child on regular basis in school environment), vacated on other grounds, 326 F.3d 560 (4th Cir 2003). Further, the reasons articulated by the Hearing Officer to justify her finding are directly contradicted by the testimony in the record, unsullied by any adverse credibility finding, as well as by the documents admitted into evidence. Susquehanna Twp. Sch. Dist. v. Frances J., 823 A.2d 249, 254-55 (Pa. Commw. Ct. 2003) (court should reverse hearing officer if record, viewed in its entirety, supports a contrary conclusion).

I find that the Hearing Officer's conclusion that the occupational therapy evaluation was not appropriate is based on legal error and is inconsistent with the totality of the record. I further find that the totality of the record compels a finding of appropriateness, so that the Mother is not entitled to an independent occupational therapy evaluation at public expense.[15] Accordingly, I recommend that this Court reverse the Hearing Officer and enter judgment in favor of the School with respect to an independent occupational therapy evaluation.

---

[14] The Mother objected to the admission of the Wolf School's list of formal and informal assessments based on its alleged late production by the School. However, the record revealed that the School produced the list almost as quickly as it was obtained from the Wolf School. Moreover, the Mother cannot argue that she was surprised that the Wolf School performed additional assessments because the resultant IEP was presented to her by the Wolf School staff at the IEP meeting held on October 9, 2012.

[15] Of course, the Mother is free to procure such an evaluation at her own expense. 34 C.F.R. § 300.502(c); RI-BRESE § 300.502(c). If she does, the School is required to consider it. Id.

b.   Should the Hearing Officer Have Ordered "Psychoeducational" Evaluations?

The second ruling by the Hearing Officer – the *sua sponte* order that the School must pay

for an extensive array of  "psychoeducational" evaluations – is barred by the Settlement

Agreement, is inconsistent with the totality of the record and is outside the scope of the power of

the Hearing Officer.

The Settlement Agreement compromised the Mother's request for comprehensive and

independent evaluations for the 2011-2012 and 2012-2013 school years.  In her Decision, the

Hearing Officer adverts to the Settlement Agreement's bar to further neuropsychological testing,

but ignores the rest of its terms, finding instead that "[t]aking everything into consideration, this

Hearing Officer believes the Parent has some legitimate concerns."  Decision at 26.  Based on

the fact that the Mother "has been requesting independent evaluations for some time," while

ignoring the Mother's binding agreement to compromise those requests, the Hearing Officer

"order[ed] a comprehensive psychoeducational evaluation, which should include assessments in

reading, writing, math, sensory difficulty, written language, executive function, behavior,

independent functions, difficulty with balance and gross motor skills, and assistive technology."

Id. (emphasis in original).

This ruling imposes the precise remedy that the School unambiguously contracted to

avoid, and the Mother unambiguously agreed to waive, in the Settlement Agreement.  By giving

up the arguable right to more evaluations, the Mother obtained for PJ the substantial benefits

conferred by the Agreement, most importantly the right to attend the Wolf School at public

expense, a placement that Dr. Imber described as "a good placement" and "beautiful."  Tr. Vol.

IV at 97-98, 101.  Accordingly, the Hearing Officer's order for a comprehensive

psychoeducational evaluation is legally erroneous because it confers a remedy barred by the doctrine of *res judicata*.

Apart from *res judicata*, this stunning expansion of the evaluations to be forced on PJ, a child who experienced such anxiety from undergoing the four required by the Settlement Agreement, imposes an obligation different from what the Mother requested and that is not based on the evidence. Dr. Imber opined only that the School's four evaluations were not sufficient. Tr. Vol. IV at 92-93, 99-100. More importantly, he testified that, as best he could tell, PJ seemed to be doing well at the Wolf School, so that his opinion was focused only "on fine tuning the program, that's where I think having an independent educational evaluation definitely comes in." Id. at 101. Every educator who testified concurred that no new evaluations were needed. Tr. Vol. I at 127-36; Tr. Vol. II at 8, 35, 58-59, 64, 96-97, 102-03, 111; Tr. Vol. III at 31-32, 49, 57, 81-82; Tr. Vol. IV at 8, 26, 50. The Hearing Officer conceived of this list of new testing *sua sponte*, as the Mother concedes in her Supplemental Memorandum. ECF No. 18 at 5.

The Hearing Officer's only articulated factual foundation for her order – the Mother "has been requesting independent evaluations for some time" – is illogical[16] but also contradicted by the Settlement Agreement. The Mother's prior requests were terminated by her agreement to forego further testing beyond a specified set in exchange for the many benefits conferred by the Settlement Agreement. See W. Chester Area Sch. Dist., 2005 WL 2396968, at *6 (parents' challenge to evaluations weakened by settlement agreement expressing their consent to them). Accordingly, the Hearing Officer's decision to place such weight on her prior requests, which

---

[16] The Mother's right to independent evaluations is legally limited by IDEA to instances where she disagrees with an evaluation done by the School. 34 C.F.R. § 300.502(b); RI-BRESE § 300.502(b). The Hearing Officer's *sua sponte* order is not for independent evaluations but rather for comprehensive evaluations, presumably to be done by the School. In light of the regulatory scheme, it is difficult to understand how the Mother's historic requests for independent evaluations relate to the need for a comprehensive set of new evaluations.

were withdrawn by a binding settlement, is error.  Without this factual foundation, the order for new testing has no basis in the record.

With no evidence suggesting educational necessity and the Mother's request cabined by the Settlement Agreement, the Hearing Officer's *sua sponte* order for an exponential expansion of the required testing to be inflicted on a child for whom a modest array was torture must also be reversed because neither IDEA nor the applicable regulations authorize a hearing officer to impose evaluations not requested by the parent or the agency or deemed necessary by the educators familiar with the child or by any other qualified expert.  See 34 C.F.R. § 300.305(a); RI-BRESE § 300.305(a); Hempfield Sch. Dist., 38 IDELR P at 281 (*sua sponte* order for reevaluation not requested by parents or school error of law).  I find that the Hearing Officer acted outside the scope of her authority in ordering such an extensive array.

In sum, based on the doctrine of *res judicata* and the absence of factual support in the record or authorization in the law, I recommend that this Court reverse the Hearing Officer and grant judgment in favor of the School with respect to the order for new evaluations.

## V.   **CONCLUSION**

Based on the foregoing, I recommend that this Court grant the School's motion for summary judgment (ECF No. 11) and deny the Mother's cross motion for summary judgment (ECF No. 13).  Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within fourteen (14) days after the date of service.  See Fed. R. Civ. P. 72(b); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision.  See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
September 19, 2013